**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| ROBBIE MARTIN,<br><br>                    Petitioner,<br><br>vs.<br><br>JAMES A. YATES, Warden,<br><br>                    Respondent. | Civil No.        08-2203 BEN (BLM)<br><br>**REPORT AND RECOMMENDATION RE: DENIAL OF PETITION FOR WRIT OF HABEAS CORPUS** |

**I.     INTRODUCTION**

Robbie Martin, a state prisoner represented by counsel, has filed a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 challenging his San Diego County Superior Court convictions in case number SCE 239548/SCE241373 for one count of carjacking, one count of attempted carjacking, one count of attempted murder and one count of special circumstance murder. (Lodgment No. 1, vol. 1 at 00260-63.) The jury also found Harris personally used a firearm as to each count and personally discharged a firearm as to the attempted carjacking, attempted murder and murder. (*Id.*)

Martin contends his federal constitutional rights were violated because the jury instructions were improper. (*See* Pet. at 6-7; Pet'rs Ex. B.) He also argues that the California Supreme Court should "reconsider its earlier holding in *People v. Webster* (1991) 54 Cal. 3d 411 . . . ." (Pet. at 8; Pet'rs Ex.

B.)

The Court has considered the Petition, Respondent's Answer and Memorandum of Points and Authorities in Support of the Answer, and the Lodgments and Exhibits submitted by the parties. Based upon the documents and evidence presented in this case, and for the reasons set forth below, the Court recommends that the Petition and the request for an evidentiary hearing be **DENIED**.

## II. FACTUAL BACKGROUND

This Court gives deference to state court findings of fact and presumes them to be correct; Petitioner may rebut the presumption of correctness, but only by clear and convincing evidence. 28 U.S.C. § 2254(e)(1) (2008); *see also Parke v. Raley*, 506 U.S. 20, 35-36 (1992) (holding findings of historical fact, including inferences properly drawn from these facts, are entitled to statutory presumption of correctness). The facts as found by the state appellate court are as follows:

A. *Prosecution Evidence*

*The Arnquist Carjacking (Count 1)*

On December 28, 2003, at 10:45 p.m., Steven Arnquist was driving a black Honda Civic, equipped with aftermarket items, including a premium stereo system, 17-inch chrome rims and low profile tires, when he stopped at an automated teller machine in the parking lot of a shopping center in Spring Valley. Arnquist's fiancée, Taniesha Taylor, was a passenger in the vehicle. When Arnquist realized he had not signed the check he planned to deposit, he returned to this car and sat in the driver's seat to sign the check. The driver's side door was open. Taylor stood outside the car next to him.

Suddenly, two men ran up to Arnquist and Taylor, who began screaming. One man held a gun in Arnquist's face and told him to hand over his wallet; Arnquist complied. The man ordered Arnquist to get up, but when Arnquist began to stand up, the man hit him with the gun and pushed him back into the car. The other man opened the passenger door and ordered Arnquist to pop open the trunk with the trunk release, give the car keys to the first man and get out of the car. Arnquist did what he was told to do. The second man then grabbed Taylor's hair, held a gun to her head, pulled her to the back of the car and ordered her to get in the trunk.

Virgilio Villegas, who had just left the grocery store in the shopping center, noticed a commotion in the parking lot and drove toward it. When he saw a woman on the ground, Villegas started honking the horn and flashing the headlights on the people near Arnquist's Honda. Upon hearing the horn, the man who was holding Taylor released her and said, "Let's get out of here," and entered the Honda on the passenger side. The first man drove away. Villegas telephoned 911 and drove Arnquist and Taylor to a sheriff substation nearby.

Arnquist said the man who first approached him was more husky than the other man. Arnquist described the assailants as two Asian men who were approximately five feet, eight inches to five feet, ten inches tall and weighed between 200 and 225 pounds. Taylor thought the men were either Filipino or Mexican. Both men wore hooded sweatshirts and masks. One of the men wore camouflaged-type pants.

The following day, Martin, who worked as a security guard at the Sycuan casino told two of his coworkers, Curtis Kellas and Joseph De Benedetti, about a recent Spring Valley carjacking in which he and his partner held two unknown individuals at gunpoint and took their vehicle. Martin described how he loved the carjacking and described it from "start to finish," according to De Benedetti. Martin drew a street map of the shopping center. Sison [Martin's co-defendant] glanced at the map and nodded his head. Martin said: "'Oh, hey, I was talking    about what we did the other night, this kind of stuff. You know what I mean?'" Sison responded, "'Oh, yep, yep.'" According to De Benedetti, Sison did not seem surprised and displayed a "ha, ha, ha, hee, hee, hee, yep, that kind of attitude."

On December 30, sheriff deputies recovered Arnquist's car from a residential area in Spring Valley. The car no longer had the premium stereo system, wheels or rims. The axle was bent, and the car could not be driven properly.

In May 2004, Arnquist and Taylor were shown lineups. Arnquist did not recognize any one in the first photo page and when he was asked to look again, he pointed to a picture of Martin and said he looked familiar and could have been one of the men involved. Arnquist could not identify Sison. Taylor was unable to identify either Martin or Sison from the photographic lineup. At trial in 2005, Arnquist could not identify Martin or Sison.

*The King Attempted Carjacking and Attempted Murder (Counts 2 & 3)*

On the evening of March 4, 2004, Martin arranged a meeting on Sweetwater Lane with Benjamin King, from whom he was purchasing anabolic steroids. At about 9:15 p.m., King was sitting in his vehicle parked on the street with the motor running when he saw two men approaching from the rear. One man, whom King later identified as Martin, walked up to the passenger side of the vehicle and knocked on the window. King motioned for the man to get into the vehicle. The man stepped back, pulled a bandana over his face, opened the truck, stuck a gun in King's face and ordered King to get out of the car. At the same time, the other man, whom King later identified as Sison, opened the driver's side door and pistol whipped King. King released the emergency brake and floored the gas pedal. As the vehicle began to move, Martin, who was partially in the vehicle, fired a shot at King. The bullet hit the post behind King's head, but shrapnel struck King in the shoulder. Then Sison fired a shot at King, but missed. King quickly drove away.

King had never met Martin before. All of their discussions leading to the unconsummated sale had been on the telephone. Martin had been referred to King by his coworker De Benedetti. After the attempted carjacking, King left De Benedetti a voice mail message asking De Benedetti not to tell Martin anything about him. That night King did not contact law enforcement because he believed authorities would not do anything and because he did not want to get in trouble for selling steroids. The following day, King changed his mind and contacted authorities.

In late March, Sheriff Detective Douglas Akers received information from Sycuan Gaming about a carjacking that had occurred on December 28, 2003. Sycuan security put Akers in contact with Kellas and De Benedetti. Kellas gave Akers a pocket-sized digital recorder with a recording of portions of the December 29 conversation between him, De Benedetti and Martin. During his interviews with Kellas and De Benedetti, Akers also learned about the attempted carjacking and shooting of King. [footnote 4 omitted].

///

On March 24, Akers interviewed King, examined the vehicle King had been driving on March 4 and showed King two photographic lineups. King identified Sison in one of the photographic lineups. In the other, King initially said the photograph of Martin looked like the other man, but was thinner. Ultimately, King selected the photograph of another man in the lineup as the second assailant. [footnote 5 omitted.]

On April 20, sheriff deputies arrested Martin and Sison. After advising Martin of his *Miranda* (*Miranda v. Arizona* (1966) 384 U.S. 436) rights, Akers told him that he was a suspect in the Arnquist carjacking. At first Martin denied any participation. Martin also denied knowing King. After Akers showed Martin cellular phone records showing he and King had numerous calls with each other, Martin said he was trying to buy steroids from King. After Akers played the recording of the conversation Martin had with Kellas and De Benedetti the previous December, Martin admitted he had carjacked Arnquist's vehicle.

After receiving his *Miranda* rights advisement, Sison denied knowing King. Akers then confronted Sison with a piece of paper from his car that had King's name and cellular phone number on it, and Sison admitted he knew King. When Akers played the recording of Martin telling Kellas and De Benedetti about the Arnquist carjacking, Sison denied participating in the crime and said that Martin was not referring to him in the recording.

*The Luna Murder (Count 4)*

On April 8, Francisco Luna and his girlfriend went out to dinner to celebrate his birthday. Luna owned a black Lexus with 20-inch Diablo wheel rims, a dashboard television that flipped up, a television on the passenger's visor and a television on the driver's visor. Luna dropped his girlfriend off at her home around 9:30 p.m. and said he was meeting someone. Luna had told his cousin that he was going to look at a gun he wanted to buy.

On April 9, a bicyclist on International Road in South San Diego saw shell casings, blood and drag marks on the road. [footnote omitted.] The bicyclist followed the drag marks to a brush area and discovered a dead body underneath a piece of carpet. The body was on its back with the arms extended, indicating it had been dragged. The arrangement of the clothing on the body also indicated it had been dragged. From a thumbprint on the body, San Diego police identified the victim as Luna.

The autopsy revealed the cause of death was multiple gunshot wounds. The first wound was a perforating gunshot wound to the back of Luna's head. The wound was a contact range wound; it was inflicted with the end of the gun barrel against the skin. This wound was fatal; the bullet separated the brain from the brain stem. The second wound was a perforating gunshot wound on the right side of Luna's head and would have been fatal as well. There were six other gunshot wounds in his left arm, upper chest area, lower chest and upper abdomen area, right buttock, right leg and left forearm.

Police received their first solid lead from Jason McDaniel, who was a friend of Luna and Martin. McDaniel revealed that a couple days before Luna was killed, Martin had asked him about Luna. Martin wanted to know if Luna carried a gun and who might back up Luna if he got into trouble or ran into gang members. McDaniel said he had not thought much about Martin's questions at the time, but after Luna was murdered he immediately connected the conversation to Luna's murder. McDaniel also said that a few days after Luna's murder, Martin visited him and asked him if he wanted to buy rims. The rims were the same ones as those on Luna's Lexus.

///

After interviewing McDaniel, homicide detective Jonathan Smith conducted a background check on Martin and learned that Martin had been employed at Sycuan casino and was in custody for a carjacking and shooting in Spring Valley.

On May 7, Smith and another detective interviewed Thomas Di Francesco, a slot machine attendant at Sycuan Casino who had become Martin's friend while they worked at the casino. Initially, Di Francesco denied knowing anything about a black Lexus and someone named Luna. When confronted with records showing numerous calls made between his phone and Martin's cellular phone on April 8, Di Francesco said he was asleep at home that night and did not know why Martin called him so many times. After the detectives told Di Francesco they did not believe him and emphasized the seriousness of the crime they were investigating, Di Francesco said he had had a conversation with Martin and had taken Martin to the location where the Lexus was found. Di Francesco showed the detectives where the Lexus was found.

Di Francesco agreed to go to police headquarters and repeated the story he had told the detectives. However, Di Francesco added that there was another person with Martin, whom he though was named "Jeff." Di Francesco said "Jeff" arrived in the black Lexus, which had shiny rims. "Jeff" went to a liquor store and obtained a crate to put under the tires after the tires were removed. Di Francesco said Martin became frustrated with him because he did not know how to "jack up" a car; Martin pushed Di Francesco out of the way to do it himself. The rims were placed in the back of Martin's car. Di Francesco said he had spoken with Sison but did not know him.

On June 9, Smith and another detective reinterviewed Di Francesco. Initially Di Francesco denied going to Martin's residence on the night Luna was killed and said he was not holding anything back. But later, after seeing cellular phone data, Di Francesco started crying and asked, "'What if I witnessed something?'" Di Francesco confirmed he was there when Luna was killed, but said he did not know that it was going to happen. Di Francesco also said he had heard Martin describe the gun as a .380 caliber gun. Subsequently, Di Francesco showed the detectives where Luna was killed, where his truck and Luna's Lexus were parked, how he and the others walked down to the field, were each person was standing and where the firing began.

In October, Di Francesco was informed he would not be prosecuted for stripping Luna's car or disposing of the stolen property from the vehicle. Di Francesco testified at trial that he did not expect to be prosecuted.

At trial, Di Francesco was the prosecution's chief witness and testified as follows: Di Francesco telephoned Martin on the afternoon of April 8 to inquire about stereo equipment, which Martin was selling. During the conversation, Martin asked if Di Francesco knew anyone who wanted to buy a gun. Throughout the day, Martin and Di Francesco talked several more times, and Martin invited Di Francesco to come to his house around 11 p.m. Martin also instructed Di Francesco to say, "'I forgot it,'" when he arrived. Di Francesco drove his Ford Ranger to Martin's residence, where Martin, Sison and Luna were standing outside. Martin asked, "'Did you bring it?'" Di Francesco had forgotten Martin's earlier instruction and responded, "'Bring what?'"

Martin introduced Di Francesco to Luna and they discussed Luna purchasing a gun from Martin. When Luna went to his car to get something, Sison pulled a gun from his waist band [sic] and handed it to Martin, who tucked the gun in his waistband. Sison said, "'Here, you do it.'" When Luna came back to the group, he wanted to make sure the gun worked properly, and they decided to go somewhere to test fire the gun. Sison rode with Di Francesco in his Ford Ranger truck, and Martin and Luna left in Luna's Lexus, with Martin driving.

   Di Francesco and Martin drove South on Highway 54, exited shortly before reaching the border and parked at the end of a dead-end street in a residential neighborhood. The foursome walked down stairs that led to an unpaved road along a river bed. After about 20 yards, Martin left the group and walked up an embankment. Then Sison walked into some bushes. Martin suddenly turned around, mumbled something and fired a gun at Luna. As Luna turned to run, Martin shot him in the back. Luna began running and was begging Martin to stop. Martin chased Luna while continuing to fire shots. [footnote omitted.] Sison came out of the bushes and also started chasing Luna. After the shooting stopped, it appeared that Martin and Sison were tugging at Luna's leg. Martin jogged back to where Di Francesco was standing, and, within a moment, Sison followed, but he was limping. Martin, Sison and Di Francesco returned to the vehicles. Martin drove with Di Francesco and told Sison to drive the Lexus. The Lexus was driven to "The Spot," a street in a residential area of Spring Valley where cars are frequently stripped. They decided not to strip the car at that time, and Martin told Di Francesco to go home.

   Between 1:30 a.m. and 2:00 a.m. on April 9, Martin telephoned Saroun Morn, a coworker at Sycuan casino, and asked if Morn had a garage where he could store a Lexus. Morn heard a voice in the background, which he thought was Sison's voice, but was not sure. Morn told Martin he did not know of any place to store the Lexus.

   Later in the morning, Di Francesco met with Martin and Sison and went to an apartment complex in El Cajon, where Sison parked the Lexus in an alley. Di Francesco watched as Martin and Sison, both of whom were wearing gloves, stripped down the Lexus. Martin and Sison removed the rims and put them in the back of Di Francesco's truck. Other items from the Lexus were put in Martin's vehicle. The stripped Lexus was left in the alley.

   Sometime in April, Marin tried to sell 20-inch Diablo chrome rims to some of his coworkers in the employee parking lot of the casino. Martin said the rims were from a Lexus.

   The prosecution also presented Martin's cellular phone records, where [sic] indicated he drove from Spring Valley to South San Diego on two separate occasions between the late night hours of April 8 and the early morning hours of April 9. The records also showed, among other things, a large number of calls between Martin and Sison, and Martin and Di Francesco during those hours.

### B. *Defense Evidence*

*Martin's Defense*

   Martin admitted he carjacked Arnquist's car on December 28, 2003. Although he and Sison initially believed the car was unattended and only intended to steal the car, they decided to take the car in any event after they saw Arnquist.

   Martin also admitted that he had made plans to buy steroids from King on March 4, 2004, but said he sent Sison and Di Francesco to meet King and make the purchase. Martin said he did so because his girlfriend was expecting him that night. Martin testified he spent the evening with his girlfriend and did not see Sison or Di Francesco until the next day. Martin asked Sison, whom he had given $200 for the steroid purchase, if he had the steroids. According to Martin, Sison told him that he and Di Francesco had tried to "jack" the car, but they had "fucked" up. Martin's girlfriend testified that he had spent the evening with her; she was sure of that because of an entry in her journal.

>Martin denied he had anything to do with Luna's murder on April 8. Martin testified as follows: Luna wanted to buy a gun, and Martin knew Di Francesco had a gun for sale. Martin arranged to be the "middle man" in the gun sale with all three meeting at Martin's residence that evening. Luna and Di Francesco arrived shortly before 9:30 p.m.; Sison, who had brought some stolen radios for Martin to sell, was already there. Di Francesco pulled out his gun; Luna wanted to test fire it because something was wrong with the clip. After suggesting Luna go someplace else to test the gun, Martin left to try to sell the radios. Martin assumed Sison left as well. Martin was informed by telephone calls that Di Francesco and Luna could not find a location to test fire the gun and suggested that Di Francesco "hook up" with Sison. Sison later telephoned Martin and suggested he meet them at a baseball field near the border, but Martin could not find the location. Martin decided to go home and telephoned Di Francesco at 12:44 a.m. to find out whether Di Francesco had sold the gun to Luna. After telling Martin that Luna did not buy the gun, Di Francesco asked Martin's help in finding a garage to house a car he had just carjacked. Martin met Di Francesco and Sison in a Spring Valley shopping center, and then the three of them left the Lexus at "the Spot" for the rest of the night. The next day, Martin, Sison, and Di Francesco stripped the Lexus in an alley near Di Francesco's residence. Martin did not know the Lexus was Luna's car until a couple of days later, when McDaniel told him that Luna had been shot.
>
>Martin also presented several character witnesses who testified that they did not believe Martin was a violent person.
>
>. . . .

(Lodgment No. 12 at 4-16.)

### III.   PROCEDURAL BACKGROUND

On June 27, 2005, the San Diego County District Attorney's Office charged Robbie Martin and Jefferson Udan Sison with one count of carjacking, a violation of California Penal Code ("Penal Code") section 215(a) (count one); one count of attempted carjacking, a violation of Penal Code sections 215(a) and 664 (count two); one count of attempted murder, a violations of Penal Code sections 187(a) and 664 (count three); and one count of murder, a violation of Penal Code section 187 (count four). (Lodgment No. 1, vol. 1 at 0141-44.) As to all counts, the District Attorney's Office also alleged that Martin personally used and intentionally and personally discharged a firearm, within the meaning of Penal Code sections 12022.5(a) and 12022.53(c). (*Id.*) A special circumstance allegation that the murder was committed during the commission of a robbery, within the meaning of Penal Code section 190.2(a)(17), was also alleged. (*Id.*)

Following a jury trial, Martin was convicted of all counts except the attempted murder charged in count three. (*Id.* at 00260-63.) The jury also found the firearm allegations to be true, with the exception of the firearm allegations attached to count two. (*Id.*) The jury found true the special circumstance allegation as to count four. (*Id.*) Martin was sentenced to life without the possibility of

parole for the murder, twenty-five years-to-life for the section 12022.53(c) allegation and fifteen years, ten months on the remaining charges and allegations. (Lodgment No. 1, vol. 2 at 00314-17; Lodgment No. 6, vol. 11 at 1733)

Martin appealed his conviction to the California Court of Appeal for the Fourth Appellate District, Division One. (Lodgment No. 7, 9, 10.) The state appellate court issued an unpublished written opinion affirming the conviction and judgment. (Lodgment No. 12.) Martin then filed a Petition for Review in the California Supreme Court, which that court denied without citation of authority. (Lodgment No. 13, 15.) Martin filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 in this Court on November 26, 2008. (*See* doc. no. 1.) Respondent filed an Answer on March 9, 2009. (*See* doc. no. 8.) Martin did not file a Traverse.

## IV. DISCUSSION

### A. Scope of Review

Title 28, United States Code, § 2254(a), sets forth the following scope of review for federal habeas corpus claims:

> The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.

28 U.S.C. § 2254(a). As amended, 28 U.S.C. § 2254(d) reads:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2).

"[The Anti Terrorism and Effective Death Penalty Act] establishes a 'highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the

doubt.'" *Womack v. Del Papa*, 497 F.3d 998, 1001 (9th Cir. 2007) (quoting *Woodford v. Viscotti*, 537 U.S. 19, 24 (2002)). To obtain federal habeas relief, Martin must satisfy either § 2254(d)(1) or § 2254(d)(2). *See Williams v. Taylor*, 529 U.S. 362, 403 (2000). The Supreme Court interprets § 2254(d)(1) as follows:

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Id.* at 412-13; *see also Lockyer v. Andrade*, 538 U.S. 63, 73-74 (2003).

Where there is no reasoned decision from the state's highest court, the Court "looks through" to the underlying appellate court decision. *Ylst v. Nunnemaker*, 501 U.S. 797, 801-06 (1991). If the dispositive state court order does not "furnish a basis for its reasoning," federal habeas courts must conduct an independent review of the record to determine whether the state court's decision is contrary to, or an unreasonable application of, clearly established Supreme Court law. *See Delgado v. Lewis*, 223 F.3d 976, 982 (9th Cir. 2000) (overruled on other grounds by *Lockyer*, 538 U.S. at 75-76); *accord Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003). A state court, however, need not cite Supreme Court precedent when resolving a habeas corpus claim. *Early v. Packer*, 537 U.S. 3, 8 (2002). "[S]o long as neither the reasoning nor the result of the state-court decision contradicts [Supreme Court precedent,]" *id.*, the state court decision will not be "contrary to" clearly established federal law. *Id.*

**B.     Analysis**

Martin presents three claims in his petition. First, he argues the trial court improperly refused to give a pinpoint instruction directing the jury to view Thoms Di Francesco's testimony with "distrust" if it found him to be an accomplice. (Pet. at 6; Pet'rs Ex. B at 5-14.) Martin contends this violated his Fifth, Sixth and Fourteenth Amendment rights to a fair trial and due process. (Pet'rs Ex. B at 14.) Second, he claims the jury was improperly instructed that in order to find Martin's co-defendant Sison guilty of murder, they had to conclude that he aided and abetted either the robbery of Luna or stealing his car. (Pet. at 7; Pet'rs Ex. B at 15-23.) Because Martin's defense was that he was not present during Luna's murder and that Di Francesco, Sison, or both were Luna's killers, Martin argues the instruction

1  told the jury the trial court had determined that Sison was not the actual killer and resulted in a directed
2  verdict of murder against Martin, in violation of Martin's federal due process and fair trial rights. (*Id.*)
3  Finally, Martin asks that the California Supreme Court reconsider its decision in *People v. Webster*, 54
4  Cal. 3d 411 (1991). *Webster* concluded the "immediate presence" element of California's robbery
5  statute was satisfied despite the fact that the victim's car, which the defendant stole after murdering the
6  victim, was a quarter of a mile from the murder scene. The court so held because the victim could have
7  retained control over the car had he not been prevented by fear or violence from doing so. *Webster*, 54
8  Cal. 3d at 440.

9        Respondent contends that none of Martin's claims present a cognizable federal claim because
10  they raise only issues of state law. (Resp'ts Mem. P. & A. Supp. Answer at 15-34.) In the alternative,
11  Respondent argues that the state court's resolution of claims one and two were not contrary to, nor an
12  unreasonable application of, clearly established Supreme Court law. (*Id.*)

13        1.    *The Accomplice Instructions*

14        The prosecution's case against Martin was based almost entirely on Thomas Di Francesco's
15  testimony about Luna's murder. Because he was present at the murder and helped strip Luna's car and
16  dispose of the items stolen from the car, the trial court gave the jury a series of instructions on
17  accomplice testimony. (*See* Lodgment No. 1, vol. 1 at 00225-33.) In addition, the defense requested
18  a separate, pinpoint instruction which told the jury they should use "greater care and caution" when
19  deciding whether to believe Di Francesco's testimony and should "view with distrust Mr. Di Francesco's
20  testimony that supports the prosecution's case" because it "may be strongly influenced by the hope or
21  expectation that the prosecution will reward testimony that supports the prosecution's case by granting
22  him immunity or leniency." (*See* Lodgment No. 2 at 002.) The trial court refused the instruction. (*See*
23  Lodgment No. 6, vol. 7 at 1081-83.) Martin claims the court's refusal violated his federal constitutional
24  rights to due process and a fair trial. (Pet. at 6; Pet'rs Ex. B at 5-14.) Respondent counters that the
25  claim does not present a cognizable federal claim and that, in any event, the state court's denial of the
26  claim was consistent with clearly established Supreme Court law. (Resp'ts Mem. P. & A. Supp. Answer
27  at 15-24.)
28  ///

Martin raised this claim in the petition for review he filed in the California Supreme Court, which denied the petition without citation of authority. (*See* Lodgment No. 15.) Accordingly, this Court must "look through" to the state appellate court's opinion denying the claim as the basis for its analysis. *Ylst*, 501 U.S. at 801-06. That court analyzed the claim as follows:

> A trial court has a sua sponte obligation to give instructions concerning accomplice testimony whenever there is testimony sufficient to warrant the conclusion that a witness implicating a defendant was an accomplice. (*People v. Zapien* (1993) 4 Cal.4th 929, 982.) For example, section 1111 prohibits conviction upon the testimony of an accomplice unless it is corroborated by evidence that tends to connect a defendant with the commission of the crime. The trial court instructed the jury along this line by giving CALJIC No. 3.11.[1] Further, the trial court instructed the jury with CALJIC No. 3.18, which directs the jury to view an accomplice's testimony that tends to incriminate the defendant with caution. (See *People v. Guiuan* (1998) 18 Cal.4th 558, 569 (*Guiuan*).
>
> [footnote 8: CALJIC No. 3.18 reads: "To the extent that an accomplice gives testimony that tends to incriminate [the] defendant, it should be viewed with caution. This does not mean, however, that you may arbitrarily disregard that testimony. You should give that testimony the weight you think it deserves after examining it with care and caution and in the light of all the evidence in this case."]
>
> Relying on Justice Kennard's concurring opinion in *Guiuan*, *supra*, 18 Cal.4th at pages 570 to 578, Martin alleges that CALJIC No. 3.18 was insufficient in this case because it failed to explain why Di Francesco's accomplice testimony should be viewed with caution. In *Guiuan*, Justice Kennard suggested that jurors would be better able to apply CALJIC No. 3.18 if they knew the reasons behind it:
>
> > "Unlike the majority, I would advise jurors of the reasons why accomplice testimony should be viewed skeptically, because jurors will understand the warning better, and will be less apt to give accomplice testimony either more or less weight than it deserves, if they understand the reasons why accomplice testimony may be inherently suspect." (*Guiuan*, *supra*, at pp. 570-571 (conc. op. of Kennard, J.)
>
> Justice Kennard observed that the testimony of accomplices should be viewed skeptically because (1) accomplices have a motive to aid the prosecution in the hope they will receive immunity or leniency for their own crime(s), (2) by virtue of their participation in the charged crime, accomplices usually are not "persons of integrity," (3) accomplices tend to minimize their role in the crime, making it appear relatively insignificant, and (4) accomplices, with their firsthand knowledge of the crime are better equipped to tell plausible lies. (*Id.* at pp. 571-575.)
>
> Acknowledging that the majority did not adopt Justice Kennard's proposed language for purposes of sua sponte instructions and her concurrence is not binding (*People v. Amadio* (1971) 22 Cal.App.3d 7, 14), Martin argues nonetheless that giving an instruction discussing the reasons to distrust accomplice testimony does not conflict with the majority holding in *Guiuan*. Because jurors may not fully understand the intensity of the pressure on an accomplice to lie, Martin asserts his proposed instruction is merely an expansion of CALJIC No. 3.18, and is particularly called for under the facts

---

[1] California Criminal Jury Instructions.

> of the case. Martin emphasizes Di Francesco's motive to lie in urging that an instruction informing the jury that an accomplice's testimony "may be strongly influenced by the hope or expectation that the prosecution will reward testimony that supports the prosecution's case by granting him immunity or leniency," should have been given. [footnote 9 omitted.]
>
> Martin is mistaken. His proposed instruction is not an expansion of CALJIC No. 3.18; the majority in *Guiuan* rejected the use of the term "distrust," and specifically endorsed the language of CALJIC No. 3.18 as adequately covering the issue of accomplice testimony. (*Guiuan*, *supra*, 18 Cal.4th at p. 569.) The majority opinion effectively rejected the alternate instruction proposed in Justice Kennard's concurrence.
>
> Although Martin acknowledges that a court is not compelled to give an instruction discussing the reasons a jury should distrust an accomplice's testimony sua sponte, he urges that it should be given when the facts of the case warrant it and the defense expressly requests it. Under this argument, Martin's proposed instruction is akin to a requested pinpoint instruction, which relates particular facts to a legal issue in the case or pinpoints the crux of the defendant's case. (See *People v. Saille* (1991) 54 Cal.3d 1103, 1119.) However, "'a trial court need not give a pinpoint instruction if it . . . merely duplicates other instructions . . . .'" (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 99.) The trial court is under no obligation to instruct the jury in a manner requested by the defendant when instructions given adequately cover the issue. (*People v. Cox* (1991) 53 Cal.3d 618, 674.) Our Supreme Court has found that CALJIC No. 3.18 "casts doubt on the veracity of an accomplice who has an obvious motive to testify falsely, while reducing the burden on the trial court." (*Guiuan*, *supra*, 18 Cal.4th at p. 569.) The court did not abuse its discretion in rejecting Martin's proposed instruction. (*People v. Kraft* (2000) 23 Cal.4th 978, 1063.) We therefore conclude that the trial court's failure to give the requested instruction was not error.

(Lodgment No. 12 at 16-20.)

Respondent first contends that Martin's claim is not cognizable on federal habeas review because it concerns only a matter of state law. (Mem. P. & A. Supp. Answer at 18-19.) An instructional error can form the basis for federal habeas corpus relief, but only if it is shown that "'the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process.' [citation omitted]." *Murtishaw v. Woodford*, 255 F.3d 926, 971 (9th Cir. 2001) (citing *Cupp v. Naughten*, 414 U.S. 141, 146 (1973)); *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977). Moreover, the allegedly erroneous jury instruction cannot be judged in isolation. *Estelle*, 502 U.S. at 72. Rather, it must be considered in the context of the entire trial record and the instructions as a whole. *Id.*

The refusal of the defense requested accomplice instruction in the present case does not rise to the level of a due process violation. Numerous instructions given to the jury told the jury to view Di Francesco's testimony with caution. California Jury Instructions, Criminal ("CALJIC") No. 2.13 told the jury that they could consider "[e]vidence that at some other time a witness made a statement or

statements that is or are inconsistent or consistent with his or her testimony in this trial" in order to determine the credibility of witness and "as evidence of the truth of the facts as stated by the witness on that former occasion." (Lodgment No. 1, vol. 1 at 00156.) The jury was also instructed by CALJIC No. 2.20 which told the jury that they were "the sole judges of the believability of a witness" and in determining such believability that they could consider the following:

> [t]he existence or nonexistence of bias, interest, or other motive . . . [a] statement previously made by the witness that is consistent or inconsistent with his or her testimony; . . . [t]he character of the witness for honesty or truthfulness or their opposites; [a]n admission by the witness of untruthfulness; [and] [w]hether the witness is testifying under a grant of immunity.

(Lodgment No. 1, vol. 1 at 00157-58.)

The court also told the jury what the term "accomplice" meant and that the accomplice instructions, CALJIC Nos. 3.11, 3.12, 3.14, 3.18 3.19 and 2.50.2, concerned Di Francesco's testimony. (*Id.* at 00225.)[2] The jury was specifically told by CALJIC No. 3.19 that they were to determine whether Di Francesco was an accomplice. (*Id.* at 00230.) If they did so determine, the jury was told by CALJIC No. 3.18 that "[t]o the extent that an accomplice gives testimony that tends to incriminate a defendant, it should be viewed with caution" and that the jury should "give [the] testimony [of an accomplice] the weight you think it deserves after thoroughly examining it with care and caution and in the light of all the evidence in this case." (*Id.* at 00229.)

Further, Di Francesco was thoroughly and aggressively cross-examined by counsel for Martin and Sison and his repeated lies to police, his motive for implicating Martin and Sison, and the numerous inconsistencies in his story were thus revealed to the jury. The jury heard that Di Francesco did not go to police of his own volition but rather was approached by police about a month after the killing. (Lodgment No. 6, vol. 2 at 416-17.) The jury also heard that Di Francesco initially told police that he had nothing to do with Luna's murder, changed his story numerous times, then eventually told police Martin and Sison had committed the killing after telling police he wanted to "save himself" and asking "What if I were a witness or something?" (*Id.* at 428-79; Lodgment No. 6, vol. 3 at 488-513; 524-25.)

---

[2] The term accomplice was defined as follows: "An accomplice is a person who is subject to prosecution for the identical offense charged in Count Four (Murder) against the defendant on trial by reason of aiding and abetting or being a member of a criminal conspiracy." (Lodgment No. 1, vol. 1 at 00225.)

1  Finally, there also was circumstantial evidence which linked Martin to Luna's murder. Jason McDaniel
2  testified that Martin asked him whether Luna was affiliated with a gang before Luna's murder and tried
3  to sell him Diablo chrome wheel rims, the same rims Luna had on his car, after the murder. (Lodgment
4  No. 6, vol. 3 at 532-35.) Saroun Morn, an acquaintance of Martin's, testified Martin called him about
5  two hours after the murder was thought to have taken place looking for a garage where he could store
6  a Lexus he had carjacked; he also told Morn he had wheel rims. (*Id.* at 565- 70.) Jorge Guerrero
7  testified that Martin tried to sell Diablo chrome rims to fellow employees in the Sycuan Casino parking
8  lot after Luna's murder. (Lodgment No. 6, vol. 4 at 585-87.)

9  The jury was fully and adequately instructed on the possible unreliability of accomplice
10 testimony and the trial court's refusal to give the requested pinpoint instruction did not render the trial
11 fundamentally unfair such that Martin's due process rights were violated. *Murtishaw*, 255 F.3d at 971.
12 For all the foregoing reasons, the state court's resolution of this claim is neither contrary to, nor an
13 unreasonable application of, clearly established Supreme Court law. *Williams*, 529 U.S. at 412-13.
14 Martin is not entitled to relief as to this claim.

15  2. *The Murder Instructions*

16  At trial, Martin contended he was not present at Luna's murder and Sison, Di Francesco, or both,
17 had actually committed the murder. Martin argues that given this defense, the jury instructions, which
18 told the jury they could find Sison guilty of Luna's murder only if they concluded he had aided and
19 abetted in either the robbery of Luna or the stealing of his car, amounted to a directed verdict against
20 Martin because it essentially told the jury the Court had concluded Sison was not the actual killer. (Pet.
21 at 7; Pet'rs Ex. B at 15-23.) Respondent argues this claim does not present a federal question because
22 it presents only a question of state law. (Mem. P. & A. Supp. Answer at 24-31.) In the alternative,
23 Respondent contends the state court's resolution of this claim was neither contrary to, nor an
24 unreasonable application of, clearly established Supreme Court law. (*Id.*)

25  Martin raised this claim in the petition for review he filed in the California Supreme Court,
26 which denied the petition without citation of authority. (*See* Lodgment No. 15.) Accordingly, this Court
27 must "look through" to the state appellate court's opinion denying the claim as the basis for its analysis.
28 *Ylst*, 501 U.S. at 801-06. That court analyzed the claim as follows:

Martin contends the trial court erred by instructing the jury pursuant to CALJIC No. 3.20 as follows:

> "One who aids and abets another in the commission of a crime is not only guilty of that crime, but is also guilty of any other crime committed by a principal which is the natural and probable consequence of the crime originally aided and abetted.
>
> "In order to find the defendant JEFFERSON SISON guilty of the crime of Murder, as charged in Count Four, you must be satisfied beyond a reasonable doubt:
>
> "1. That the crime or crimes of Robbery . . . or Unlawful Taking Of A Vehicle . . . was/were committed;
>
> "2. That the defendant JEFFERSON SISON aided and abetted that crime or those crimes.
>
> "3. That a co-principal in that crime committed the crime of Murder, and
>
> "4. The crime of Murder was a natural and probable consequence of the commission of the crimes of Robbery and/or Unlawful Taking Of A Vehicle.
>
> "In determining whether a consequence is 'natural and probable,' you must apply an objective test, based not on what the defendant actually intended, but on what a person of reasonable and ordinary prudence would have expected likely to occur. The issue is to be decided in light of all of the circumstances surrounding the incident. A 'natural' consequence is one which is within the normal range of outcomes that may be reasonably expected to occur if nothing unusual has intervened. 'Probable' means likely to happen.
>
> "You are not required to unanimously agree as to which originally contemplated crime the defendant JEFFERSON SISON aided and abetted, so long as you are satisfied beyond a reasonable doubt and unanimously agree that he aided and abetted the commission of an identified and defined target crime and that the crime of Murder was a natural and probable consequence of the commission of that target crime."

Martin contends the instruction was tantamount to a directed verdict, effectively nullified his entire defense, and placed the court's imprimatur on Di Francesco's testimony. We disagree and find no error.

Although Martin did not object to this instruction below, we nonetheless reach the substantive merits of his arguments. (§ 1259.)

A jury instruction that lessens the prosecution of its burden of proving each element of the crime beyond a reasonable doubt violates the defendant's due process rights. (*Sullivan v. Louisiana* (1993) 508 U.S. 275, 277-278; *People v. Flood* (1998) 18 Cal.4th 470, 480-481.) For example, in *People v. Figueroa* (1986) 41 Cal.3d 714, 717-718, the defendant was charged with sale of unqualified securities, and the trial court instructed the jury that the promissory notes at issue were securities. The California Supreme Court held that although the definition of a security is a question of law for the

court to determine, whether a particular instrument satisfies the definition is a factual question for the jury. (*Id.* at pp. 733-734.) The high court concluded the instruction was tantamount to a directed verdict against the defense and reversed. (*Id.* at p. 724.) Another example is *United States v. Gaudin* (1995) 515 U.S. 506, in which the defendant was prosecuted for making material false statements on federal loan documents and the trial court instructed the jury that the allegedly false statements were material. The United States Supreme Court held this instruction denied the defendant his constitutional right to have the jury determine whether the prosecution had established each and every element of the charged crime. (*Id.* at p. 510.)

That type of error did not occur here. Notwithstanding Martin's appellate arguments, telling the jury that Sison's murder culpability depended on an aider and abettor theory did not effectively tell the jury that Martin killed Luna or that it must find Martin was the killer. "The instruction could not reasonably be understood as precluding rejection of [Di Francesco's] testimony — including rejection based on a conclusion that in fact [Di Francesco] was the killer." (*People v. Heishman* (1988) 45 Cal.3d 147, 162-163.)

Moreover, the court did not instruct the jury that an element of the crime of murder had been established or suggest to the jury it need not find any of the requisite elements. Instead, the court explained that under the facts presented by the parties Sison was not the shooter who killed Luna. Di Francesco testified for the prosecution that Martin fatally shot Luna. Martin testified that he was not at the murder scene, but Di Francesco and Sison were. Sison denied he was at the murder scene. Also, there was no evidence presented that Sison was in possession of a gun after he left Martin's residence. Further, the instruction reflected the amended consolidated information, which charged both Martin and Sison with murder and alleged that Martin personally discharged the firearm causing Luna's death. The amended consolidated information did not allege Sison was personally armed with a firearm nor that he personally discharged a firearm in connection with Luna's murder.

Sison was prosecuted for Luna's murder as an aider and abettor. A trial court is obligated to instruct the jury "sua sponte on general principles which are closely and openly connected with the facts before the court." (*People v. Holt* (1997) 15 Cal.4th 619, 688 (*Holt*).) The court properly instructed the jury pursuant to CALJIC No. 3.02.

We must construe instructions in a common sense manner and as a whole. (*Holt*, *supra*, 15 Cal.4th at p. 644.) CALJIC No. 1.01 instructed the jury not to single out, as Martin has done, "any particular sentence or any individual point or instruction and ignore the others," but instead to "[c]onsider the instructions as a whole and each in light of all the others." We presume the jury followed this instruction. (*People v. Cruz* (2001) 93 Cal.App.4th 69, 73.) Martin suggests the challenged instruction deprived him of the presumption of innocence. The is not so. No reasonable juror would have interpreted the instruction in this manner in view of other instructions given, particularly the presumption of innocence in CALJIC No. 2.90. (*People v. Hardy* (1992) 2 Cal.4th 86, 151-152.)

Martin relies on two out-of-state cases to support his contention. Both are distinguishable. Martin's reliance on *People v. Soto* (1969) 276 Cal.App.2d 81, 87, in which the trial court did *not* instruct on the use of excessive force by a peace officer, is also misplaced. [footnote 10 omitted.]

(Lodgment No. 12 at 20-24.)

///

The Court reject's Respondent's argument that Martin's second claim does not present a federal constitutional question cognizable on federal habeas review. Pursuant to the Fifth and Sixth Amendments to the United States Constitution, the prosecution bears the burden of proving every element of a criminal offense beyond a reasonable doubt. *Sullivan v. Louisiana*, 508 U.S. 275, 277-78 (1993). The Due Process Clause of the Fourteenth Amendment requires the state to prove every element of a crime beyond a reasonable doubt before a defendant can be convicted. *Francis v. Franklin*, 471 U.S. 307, 313 (1985); *In re Winship*, 397 U.S. 358, 364 (1970). The Supreme Court has held that this principle "prohibits the State from using evidentiary presumptions in a jury charge that have the effect of relieving the State of its burden of persuasion beyond a reasonable doubt of every essential element of a crime." *Francis*, 471 U.S. at 307; *see Sandstrom v. Montana*, 442 U.S. 510, 520-24 (1979). There are two types of presumptions, mandatory and permissive:

> A mandatory presumption instruction tells the jury that it must presume that an element of a crime has been proven if the government proves certain predicate facts. Mandatory presumptions may be either conclusive or rebuttable. A conclusive presumption removes the element from the case once the government has proven the predicate facts. A rebuttable presumption requires the jury to find the presumed element unless the defendant persuades the jury that such a finding is not justified. An instruction violates due process "if it creates a mandatory presumption which shifts the burden of proving beyond a reasonable doubt an essential element of a criminal offense. *Washington*, 819 F.2d at 225; *Francis*, 471 U.S. at 314, 105 S.Ct. at 1971; *Sandstrom v. Montana*, 442 U.S. 510, 523-24, 99 S.Ct. 2450, 2458-59, 61 L.Ed.2d 39 (1979).
>
> A permissive inference instruction allows, but does not require, a jury to infer a specified conclusion if the government proves certain predicate facts. Although such an instruction does not shift the burden of proof, it violates due process "if the suggested conclusion is not one that reason and common sense justify in light of the proven facts before the jury." *Francis*, 471 U.S. at 314-15, 105 S.Ct. at 1971 (citing *Ulster County v. Allen*, 442 U.S. 140, 157-63, 99 S.Ct. 2213, 2224-27, 60 L.Ed.2d 777 (1979)); *Washington*, 819 F.2d at 225. [footnote omitted].

*United States v. Warren*, 25 F.3d 890, 897 (9th Cir. 1994).

To determine whether a due process violation has occurred, a court must first determine whether the jury instruction contains either a mandatory presumption or merely a permissive inference. *Francis*, 471 U.S. at 314-15. Once such a determination is made, "the potentially offending words must be considered in the context of the [jury] charge as a whole," and the determination as to whether a jury instruction violates the Due Process Clause "depends upon the way in which a reasonable juror could have interpreted the instruction." *Id.* at 315.

The aiding and abetting instruction given to the jury told them that in order to find Sison guilty of murder, they had to first find he aided and abetted either the robbery of Luna or an unlawful taking of a vehicle, a coprincipal committed Luna's murder, and Luna's murder was a natural and probable consequence of the robbery. (Lodgment No. 1, vol. 1 at 00215.) Martin contends that because the only two possible co-principals were he and Di Francesco, and Di Francesco's testimony was the only evidence placing Sison at the murder scene, the instruction amounted to an endorsement of Di Francesco's testimony, the prosecution's theory of the case and functioned as a directed verdict against Martin. (Pet'rs Mem. P. & A. Supp. Pet at 16-23.)

As the state court correctly concluded, the jury instruction did not direct the jury to conclude that Martin was the killer nor did it create a mandatory presumption such that the prosecution's burden of proof as to any element of the murder charge was lessened. There was no evidence presented that Sison was the shooter. Even Martin did not contend Sison was the shooter. Martin testified that he last saw Luna with Di Francesco and Sison discussing the sale of the gun and how and where to test fire it outside Martin's house. (Lodgment No. 6, vol. 8 at 1184, 1192-93.) He did not know where the three went after he left. (*Id.* at 1192-93.) Sison could only be guilty for Luna's murder, therefore, as an aider and abettor as there was insufficient evidence presented that he was the shooter. The instruction does not identify Martin as the co-principal nor does it present predicate facts which, if proven, would require the jury to find an element of the crime to be present. It simply states that the jury must conclude that "a co-principal in [the crime of robbery or unlawful taking of a vehicle] committed the crime of murder." If the jury believed Martin's testimony, the co-principal was Di Francesco. If the jury believed Di Francesco's testimony, the co-principal was Martin. The jury's verdict establishes that the jury resolved this credibility contest against Martin.

The jury was properly instructed as to the elements of the crime of murder and in order to find Martin guilty of murder, as they did, they were required by the instructions to find that the prosecution had proven each of those elements beyond a reasonable doubt. (*See* Lodgment No. 1, vol. 1 at 00175 [CALJIC No. 2.90, reasonable doubt instruction], 00202-11 [CALJIC Nos. 8.10, 8.11, 8.20, 8.21, 8.21.1, 9.40, 1.24, 9.41, 9.40.1, 1-1, 8.30, murder instructions].) Accordingly, the state court's resolution of this claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court

law. *Williams*, 529 U.S. at 412-13. Martin is not entitled to relief.

        3.      *Request to Reconsider the Holding in People v. Webster*

Lastly, Martin argues that the California Supreme Court should reconsider its decision in *People v. Webster*, 54 Cal.3d 411 (1991), which defined the element of "immediate presence" in California's robbery statue as an area "'within [a victim's] reach, inspection, observation, or control [such that] he could, if not overcome by violence or prevented by fear, retain his possession of it.'" *Webster*, 54 Cal.3d at 440, quoting *People v. Hayes*, 52 Cal.3d 577, 626-67 (1990). Martin made a motion pursuant to Penal Code section 1118.1[3], arguing that he could not be found guilty of the special circumstance allegation that the murder was committed for the purpose of committing a robbery because Luna's car was not in his immediate presence at the time he was murdered. (*See* Lodgment No. 6, vol. 8 at 1383-88.) The trial judge declined to grant the motion based on the California Supreme Court's holding in *Webster*. As Respondent correctly notes, Martin's claim is purely a matter of state law for which federal habeas corpus relief is not available. *See* 2254(a); *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991).

Further, to the extent that Martin is arguing that his federal constitutional rights were violated because there was insufficient evidence to support his conviction for the special circumstance allegation, his claim also fails. In assessing a sufficiency of the evidence claim, the Supreme Court has stated that "'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Juan H. v. Allen*, 408 F.3d 1262, 1275 (9th Cir. 2005) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). In determining whether sufficient evidence has been presented, the Court must accept the elements of the crime as defined by state law. *See Jackson*, 443 U.S. at 324, n. 16; *Aponte v. Gomez*, 993 F.2d 705, 707 (9th Cir. 1993) (federal courts are "bound by a state court's construction of its own penal statutes"). Given California's definition of the "immediate presence"

---

[3] Penal Code section 1118.1 states:

    In a case tried before a jury, the court on motion of the defendant or on its own motion, at the close of the evidence on either side and before the case is submitted to the jury for decision, shall order the entry of a judgment of acquittal of one or more of the offenses charged in the accusatory pleading if the evidence then before the court is insufficient to sustain a conviction of such offense or offenses on appeal. If such a motion for judgment of acquittal at the close of the evidence offered by the prosecution is not granted, the defendant may offer evidence without first having reserved that right.

1 element of robbery, as defined by the California Supreme Court in *Webster*, there was more than
2 sufficient evidence presented for the jury to convict Martin of the robbery special circumstance
3 allegation. Luna's car was parked on the road only about 20 yards from the field in which he was shot
4 by Martin. (Lodgment No. 6, vol. 2 at 388-99.) Thus, the car was sufficiently close to the murder scene
5 that it was "within [Luna's] reach, inspection, observation, or control [such that] he could, if not
6 overcome by [Martin's] violence . . . retain his possession of it." *Webster*, 54 Cal.3d at 440 (internal
7 quotation marks and citations omitted.)

8 For the foregoing reasons, Martin is not entitled to relief as to his claim regarding the California
9 Supreme Court's ruling in *Webster*, nor on any claim that there was insufficient evidence presented to
10 support his conviction for the robbery special circumstance allegation.

11 **V.   CONCLUSION AND RECOMMENDATION**

12 The Court submits this Report and Recommendation to United States District Roger T. Benitez
13 under 28 U.S.C. § 636(b)(1) and Local Civil Rule HC.2 of the United States District Court for the
14 Southern District of California. For the reasons outlined above, **IT IS HEREBY RECOMMENDED**
15 that the Court issue an Order:  (1) approving and adopting this Report and Recommendation, and (2)
16 directing that Judgment be entered denying the Petition.

17 **IT IS ORDERED** that no later than **September 18, 2009,** any party to this action may file
18 written objections with the Court and serve a copy on all parties.  The document should be captioned
19 "Objections to Report and Recommendation."

20 **IT IS FURTHER ORDERED** that any reply to the objections shall be filed with the Court and
21 served on all parties no later than **October 9, 2009**.  The parties are advised that failure to file objections
22 within the specified time may waive the right to raise those objections on appeal of the Court's order.
23 *See Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153, 1156 (9th
24 Cir. 1991).

25 DATED: August 27, 2009

26

27 BARBARA L. MAJOR
United States Magistrate Judge

28